## Shepherd v. Commonwealth.

(Decided June 15, 1937.)

PATRICK & SUBLETT for appellant.

HUBERT MEREDITH, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

On a Sunday afternoon in March, 1936, Jack Wireman and several other men were gathered at the home of Walter Johnson on Big branch in Magoffin county. Frank Shepherd had gone down from his home in Johnson county and stopped there early in the afternoon on

his way to the residence of Henderson Neely, his father-in-law, about 500 yards distant. He started back home after dark with Junior Shepherd riding behind him on a mule and stopped at Johnson's home for Junior to get a drink of water. While Johnson and Junior had gone around the house, according to Liberty Coffee, Frank Shepherd, without saying a word, "jerked his gun and threw it on me and asked if I had a knife." Coffee threw up his hands and showed Shepherd he had no knife. Then Jake Wireman "jerked his gun out of his hand," and pointing it to the ground said: "Frank, take her off of him, he hain't done anything to you." Continuing to tell what happened, the witness related: "He just stood there, just a breath, with a gun on me, and he just wheeled and threw his gun on Jake and said, 'don't raise her any higher.'" He said that about twice and jumped and grabbed Jake and commenced shooting. Several shots were fired, and Jake Wireman was wounded in three or four places and he died in a short while. Coffee and the deceased had been drinking that day and "Jake was drunk enough to be funny." Frank Shepherd acted like he was sober. Walter Johnson testified that when Shepherd called at his home in the afternoon he wanted to buy some liquor. On his return trip he had called Johnson out of the house and several others in the party went into the yard also. After the shooting Johnson went down to Neely's, and when he got back home Wireman was in the yard dead with a pistol laying on his breast. It had been fired once and then had jammed. Arthur Whitaker testified that Frank Shepherd was drinking that afternoon, the conclusion apparently having been reached because "he was getting the mule by the ears" (explained as twirling the mule's ears). As he sat on his mule, not long before starting up the branch toward Johnson's, Shepherd said to Earnie Neely: "I have got some good little pills to feed fellows." Another witness testified "he acted like he was very well drunk."

The defendant testified that he had gone early in the afternoon to the home of his father-in-law, Henderson Neely, to get his wife some seed beans. He had left Walter Johnson's about 4 o'clock and there was a "big bunch of men there drinking and having a big time." He never tried to buy any liquor and never in his life had he seen Arthur Whitaker, who had testified to his

being drunk and twirling his mule's ears at Henderson Neely's. When he reached Johnson's home on his return, several men came out of the house and they were laughing and talking about Neely's fence having been torn down, when Jake Wireman and Liberty Coffee came out and one of them said: "Boys, what in the hell are you laughing about; tell us and we will laugh too." He described by gestures where the parties were standing, and testified that he saw "these boys punch each other and this Coffee boy had his hands back behind him and I saw a knife, it looked to me like about a four or three and one-half inches in the blade and he had it in his hand, and I says, 'What are you going with that big knife in your hand,' and as I said that, he wheeled and as I wheeled, he struck me right there on the coat and as I fell against the house Wireman went to pull his gun and I pulled mine and began to jump from one place to another a shooting.

"Q. Did he fire the first shot there? A. Yes sir, he did."

The defendant testified that he had seen Coffee once, and knew him, but he had never seen Wireman before that day. He shot because he was afraid Wireman was going to kill him. After he had shot Wireman he caught his mule and came back to the house, and Mrs. Johnson told him about having found some knives. He looked pretty close and saw another knife on the ground close to Wireman's body. He had not drunk any liquor that day. After the shooting he went home and hid out in the woods for a week and then, because he was afraid not to leave the country, he went to Oklahoma and changed his name. About a year afterward Shepherd was arrested there on a local charge and told the officers he was wanted back in Kentucky. The defendant had served a term in the penitentiary upon the charge of wounding another with intent to kill, but was "conditionally pardoned" about three months before this trouble. Junior Shepherd, his first cousin, fully corroborated him, except that he did not see the shooting, having gone around the house with Walter Johnson to get a drink of water. However, he came back right away and saw two knives near Wireman's body, one of which was open and the other closed. Mrs. Johnson picked up the knives and put them in her pocket. She had died before the trial. Henderson Neely, his wife, and son testified that the defendant was sober at

their house and that Arthur Whitaker came there after Frank Shepherd had gone. Early in the afternoon Jake Wireman and Liberty Coffee had come down there and wanted to borrow 50 cents, but Neely didn't have the change. "They were wanting to swap knives with each other." After the killing Neely saw a red-handled and white-handled knife up at Johnson's. Brice Shepherd, who had been at Johnson's during the afternoon but had left before the shooting, testified that both Wireman and Coffee were drunk, but Shepherd was not. Wireman had shown him his pistol that day. Marius Bailey, who had spent the afternoon at Johnson's, testified that when Wireman and Coffee came out to where the defendant and the other men were laughing and talking, the first word he heard was Shepherd asking Coffee what he was going to do with that knife. Coffee responded that he didn't have any knife. He heard Wireman tell him not to do that and saw him draw his pistol on Shepherd. The shooting began and the witness ran.

Under this evidence Shepherd was found guilty of voluntary manslaughter and sentenced to serve seven years in the penitentiary. We cannot say that the verdict is flagrantly against the evidence, as the appellant contends.

Complaint that the jailer went into the jury room while the case was being considered and that the commonwealth's attorney had made prejudicial statements during his argument cannot be considered, as neither incident is contained in the bill of exceptions.

In support of one of the grounds for a new trial, the appellant filed the affidavit of his attorney to the effect that just after the verdict had been rendered he heard Martin Marshall, one of the jurors, say to Rena Marshall that he knew he was kin to Jake Wireman and didn't care who knew it; that he was one of the jurors who had stood for "the highest conviction of the defendant of any man on the jury"; that while they were deliberating on the case he told the other members that the judge had told him that the first man he found holding out and refusing to make a verdict agreeable with the other eleven jurors he would discharge him; that one of the jurors was in favor of giving the defendant only two years, and he (Marshall) told him that he intended to report that fact to the judge, and when he

did that the juror agreed to a sentence of seven years instead of two years.

This statement was neither contradicted nor supported. In Miller v. Com., 203 Ky. 437, 262 S. W. 579, where there were affidavits definitely showing close relationship of two jurors to the deceased in a murder case, it is said that the proper practice is for the trial court to give the commonwealth an opportunity to be heard in such a matter. In that case the commonwealth's attorney produced one of the jurors, who contradicted the allegation of relationship, but he did not produce the other or introduce any evidence concerning his alleged relationship. This fact warranted the assumption that the charges contained in the affidavit were true as to this juror and that the trial court committed an error in refusing to grant a new trial. In applying the provisions of section 210, Criminal Code of Practice, in Sizemore v. Com., 210 Ky. 637, 276 S. W. 524, it was definitely established that two jurors were closely related to the man who had been killed, which relationship they had not disclosed upon their voir dire examination with respect to their qualification, and the defendant did not know of that relationship until after the trial. It was held the accused had been deprived of a fair and impartial trial and the judgment of conviction was reversed.

But in the instant case the relationship of the juror to the deceased was shown only by hearsay—that he said to another person that he was kin to him. No effort was made to show whether he was related as a matter of fact, and, if so, what the degree of that relationship was. Cf. Cox v. Commonwealth, 255 Ky. 391, 74 S. W. (2d) 346. It was not shown that the prospective juror had been interrogated as to his qualifications and had answered falsely. It was not shown that if he was related to the deceased the defendant was ignorant of that fact before the jury was discharged. On this phase of the ground for a new trial we conclude the defendant did not present a prima facie case of implied bias authorizing the setting aside of the verdict.

The other ground covered by the affidavit and motion, namely, that the juror had stated that he had influenced another to agree to a penalty of seven years, is likewise unavailing. It is a Code provision and a rule of practice for a long time that a member of a jury

,will not be permitted to impeach the verdict by showing his or another's misconduct except to establish that it was made by lot. Section 272, Criminal Code of Practice, and Annotations; also, Cox v. Commonwealth, supra.

Perceiving no prejudicial error, the judgment is affirmed.